USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/24/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                        :

N.M., et al.,                              :

                                :

                Plaintiffs,          :             15-CV-1781 (JMF)

                                :

              -v-                  :          OPINION AND ORDER

                                :

NEW YORK CITY DEPARTMENT OF EDUCATION,  :

                                :

                Defendant.          :

                                :

-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Plaintiffs N.M. and M.M. ("Plaintiffs"), individually and on behalf of their disabled child

M.M. ("M.M."), bring this action pursuant to the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, challenging the education program offered to M.M. by the

New York City Department of Education ("DOE").  Plaintiffs ask this Court to vacate the

decision and order of a New York State Review Officer ("SRO") and award reimbursement for

M.M.'s education costs as a result of the DOE's alleged denial of a free appropriate public

education ("FAPE").  As is common in IDEA actions, each side now moves for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons discussed

below, Plaintiff's motion for summary judgment is DENIED, Defendant's cross-motion for

summary judgment is GRANTED, and the decision of the SRO is affirmed.

## BACKGROUND

### A.  The Legal Framework

      "Congress enacted the IDEA to promote the education of students with disabilities."

*M.P.G. ex rel. J.P. v. N.Y.C. Dep't of Educ.*, No. 08-CV-8051 (TPG), 2010 WL 3398256, at *1

(S.D.N.Y. Aug. 27, 2010).  The statute requires any state receiving federal funds to provide disabled children with a "free and appropriate public education ('FAPE')."  *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012).  To that end, school districts are required to "create an individualized education program ('IEP') for each such child" with disabilities.  *Id.* at 175 (citing 20 U.S.C. § 1414(d); *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)).  An IEP is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *R.E.*, 694 F.3d at 175 (internal quotation marks omitted).  An IEP must be "reasonably calculated to enable the child to receive educational benefits."  *Id.* (internal quotation marks omitted).

In New York, a Committee on Special Education ("CSE") — composed of the student's parent or parents, a regular or special education teacher, a school board representative, a parent representative, and others appointed by the local school district's board of education — is responsible for developing an IEP.   *See* N.Y. Educ. Law § 4402(1)(b)(1); *see also Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998).  When doing so, a "CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." *R.E.*, 694 F.3d at 175.  To comply with its substantive obligations under the IDEA, a school district must provide "an IEP that is 'likely to produce progress, not regression.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130).   "Should a parent believe that the school district breached these IDEA duties by failing to provide their disabled child a FAPE, the parent may unilaterally place

their child in a private school at their own financial risk and seek tuition reimbursement." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013).

"To begin the tuition-reimbursement process, a parent must first file a due-process complaint which triggers an administrative-review process. . . ." *Id.* (citing 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).  If a parent files a due process complaint, the school district has thirty days to remedy any deficiencies identified in the complaint without penalty.  *See R.E.*, 694 F.3d at 187-88 (citing 20 U.S.C. § 1415(f)(1)(B)).  If, at the end of this thirty-day "resolution period," the parent feels his or her concerns have not been adequately addressed, the parent can continue with the due process claim.  *See id.*  The IDEA then mandates that a state provide an impartial due process hearing before an impartial hearing officer ("IHO").  *See id.* at 175 (citing 20 U.S.C. § 1415(f)).  "The three-pronged *Burlington/Carter* test, as construed by New York Education Law § 4404(1)(c), governs that hearing."  *M.W.*, 725 F.3d at 135; *see Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12-13 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985).  That test provides that: "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them."  *M.W.*, 725 F.3d at 135 (internal footnote omitted).  If dissatisfied with the IHO's ruling, either party may appeal the case to an SRO.  *R.E.*, 694 F.3d at 175 (citing N.Y. Educ. Law § 4404(2)).  After exhausting administrative remedies through this process, either party may bring a civil action in state or federal court to review the SRO's decision.  *See id.* (citing 20 U.S.C. § 1415(i)(2)(A)).

**B. Factual Background**

M.M. has Down Syndrome, and is classified by the DOE has having an intellectual disability. (Ex. 3, at 1).[1] When her IEP was prepared in 2012, M.M. was seventeen years old and functioning at a mid-second-grade level for independent reading, a third-grade level for instructional reading, a mid-second-grade level for reading comprehension, and a fourth-grade level for math. (Ex. 1, at 1). M.M. also struggles to have appropriate social interactions with others. (Mem. Law Supp. Mot. Summ. J. (Docket No. 15) ("Pls.' Mem.") 3-4; Ex. 1, at 1-2). Finally, she suffers from irreversible pulmonary hypertension, known as Eisenmenger's Syndrome, due to a heart defect. (Pls.' Mem. 4; Ex. 1, at 2). That condition requires M.M. to receive continuous oxygen therapy, administered by a full-time nurse, throughout the school day — even during transportation to and from school. (Pls.' Mem. 4; Ex. 1, at 2). There is no dispute that M.M. is thus a "child with a disability," who is entitled to a free appropriate education under the IDEA. 20 U.S.C. § 1401(3)(A)(i).

On January 5, 2012, a CSE convened to consider M.M.'s IEP for the 2012-2013 school year. At the time, M.M. was enrolled in a private school, the Cooke Center Academy ("Cooke" or "Cooke Center"). Meeting attendees included N.M. (M.M.'s mother); Evelyn Alvarez (a special education teacher); Aminah Lucio (the school psychologist); Carmen Garcia (a parent); and three representatives from Cooke, Elana Prusock (M.M.'s math teacher), Chaya Gray (M.M.'s English language arts teacher), and Frances Tabone (the Assistant Director at Cooke). (Ex. 1, at 17). The CSE considered several written evaluations of M.M., including: the most

---

[1]    "Ex." refers to an exhibit submitted by one of the parties during the impartial hearing; the DOE's exhibits are numbered, and the parents' exhibits are lettered. "Tr." refers to the transcript of the impartial hearing. "J.A." refers to the joint appendix that the parties have submitted to the Court under seal.

recent progress report that the Cooke Center had issued for M.M., from December 2011 (J.A. 287-307; *see* SRO Decision 6 n.6); a comprehensive psychological evaluation of M.M. dated September 2, 2011 (Ex. 3); and a comprehensive psychosocial evaluation of M.M., dated October 1, 2011 (Ex. 6).  In addition, M.M.'s teachers at Cooke provided information regarding her academic standing and Tabone, the Cooke administrator, provided information regarding M.M.'s counseling, occupational therapy, physical therapy, vocational development, and transition.  (Tr. 52-56, 356-58).  N.M. also provided input at the meeting. (Tr. 46, 356, 359)

The IEP developed by the CSE set forth several annual goals and short-term objectives for M.M.  (Ex. 1, at 4-8).  Specifically, it provided goals for "physical endurance and coordination" and "increase[d] . . . motor development"; for focus and efficiency in the classroom; for "self-care skills" and "functional independence"; for language skills, including reading and writing; and for math skills.  (*Id.*).  In furtherance of those goals, the IEP directed that M.M. be placed in a "12:1:1" classroom — that is, a classroom with twelve students, one teacher, and one paraprofessional.  (*Id.* at 9).  The IEP also provided for related services: forty-five-minute, individual sessions of physical therapy, twice per week; forty-five-minute, individual sessions of occupational therapy, twice per week; a forty-five-minute, individual session of counseling, once per week; as well as forty-five-minute, small group counseling sessions, twice per week.  (*Id.* at 9-10).  The IEP further provided M.M. with a one-on-one nurse during the school day and during transportation to and from school.  (*Id.* at 10).

In June 2012, the DOE offered M.M. a placement at the Academy for Career and Living Skills, P811X@1084X ("P811X" or "the School").  (Ex. 2).  N.M. visited the School that month and met with Miriam Luciano, the School's parent coordinator.  (Tr. 116; Ex. C).  On June 29, 2012, after visiting P811X, N.M. wrote a letter to the DOE rejecting DOE's recommended

program and placement and stating that without an appropriate program and placement, she would continue sending M.M. to Cooke and seek reimbursement. (Ex. C). On August 15, 2012, N.M. sent a brief follow-up rejection letter stating the same. M.M. attended Cooke for the 2012-2013 school year. Although N.M. paid for tuition and for a one-on-one nurse during the school day, the DOE paid for the nurse's costs during transportation. (*See* Def.'s Mem. Law Supp. Cross-Mot. Summ. J. (Docket No. 21) ("Def.'s Mem.") 5 n.5).

On March 20, 2013, N.M. filed a due process complaint requesting an impartial hearing and seeking tuition reimbursement based on the DOE's alleged denial of a FAPE to M.M. (Ex. A). An IHO held a hearing over two days, on November 1, 2013, and May 16, 2014. (*See* Tr.). On July 15, 2014, the IHO issued a decision rejecting N.M.'s claims for tuition reimbursement, finding that the IEP provided for a FAPE and that the placement in P811X was appropriate. (IHO Decision 13). The IHO found also that "[t]he evidence shows that the parent never intended for the student to be placed in any public school." (*Id.*). Nonetheless, stating she "has broad discretion in crafting an equitable remedy," the IHO ordered the DOE to pay the full cost of the nurse, not merely the costs attributable to services during transportation. (*Id.* at 13-14).

Both parties appealed the IHO's decision to New York's Office of State Review. (SRO Decision 1). On November 10, 2014, the SRO ruled in favor of the DOE. The SRO agreed with the IHO that the DOE had provided a FAPE and that P811X was appropriate, thereby rendering an award of tuition unwarranted. (SRO Decision 5-7). With respect to the IHO's holding that the DOE had to pay the full costs of the nurse, however, the SRO held that, "[h]aving found that the district offered the student a FAPE, the IHO lacked a basis upon which to predicate an award of public funding for services unilaterally obtained by the parents." (SRO Decision 7).

Thereafter, M.M.'s parents sought review of the SRO's decision in this Court, challenging its denial of reimbursement for tuition and school-day nursing services.  (Docket No. 1).

<strong>STANDARD OF REVIEW</strong>

Summary judgment motions in the context of the IDEA involve "more than looking into disputed issues of fact."  *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam).  They are a "pragmatic procedural mechanism for reviewing administrative decisions."  *M.W.*, 725 F.3d at 138 (internal quotation marks omitted).  The Court in such cases conducts an "'independent' judicial review."  *Walczak*, 142 F.3d at 129 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205 (1982)).  The Supreme Court has explained, however, that conducting an independent judicial review is not an "'invitation . . . to substitute'" the Court's "'own notions of sound educational policy for those of the school authorities they review.'"  *Id.* (quoting *Rowley*, 458 U.S. at 206).  The "district court must base its decision on the preponderance of the evidence," but it must also "give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks and brackets omitted).

Under this "due weight" standard, "the deference owed to an SRO's decision depends on the quality of that opinion."  *R.E.*, 694 F.3d at 189.  That is, familiar bright-line standards such as clear error and *de novo* review do not apply.  Instead, judicial deference to an administrative officer's decision "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the

witnesses than the reviewing court." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012). Recognizing the imprecision of this standard, the Second Circuit has explained:

> By way of illustration, determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

*Id.* (citations omitted).

In this context, "[c]ourts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *Id.* at 241 (internal quotation makes omitted). That is, reviewing courts are generally "not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence," but "must defer to the reasoned conclusions of the SRO as the final state administrative determination." *Id.* at 246. That deference is not absolute, however, and where a reviewing court "concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court . . . to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment." *Id.* Moreover, courts may not "simply rubber stamp administrative decisions," *R.E.*, 694 F.3d at 184 (internal quotation marks omitted), and may consider additional evidence not presented in the proceedings below, *see* 20 U.S.C. § 1415(i)(2)(C).

"When a state's decision under the IDEA is challenged in federal court, [the] court conducts a review of both the procedural and substantive adequacy of the underlying decision." *B.O. v. Cold Spring Harbor Cent. Sch. Dist.*, 807 F. Supp. 2d 130, 134 (E.D.N.Y. 2011).  First, "courts examine whether . . . the state has complied with the procedures set forth in the IDEA." *R.E.*, 694 F.3d at 190 (internal quotation marks omitted).  Second, courts "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks and brackets omitted).  While substantive inadequacy automatically entitles parents to reimbursement, procedural violations do so only "if they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'"  *Id.* (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)) (alteration in original).  Procedural violations must be considered cumulatively.  *See M.W.*, 725 F.3d at 139 (citing *R.E.*, 694 F.3d at 190)).

## DISCUSSION

Plaintiffs appeal on both procedural and substantive grounds.  First, Plaintiffs contend, as a procedural matter, that the CSE did not have adequate information when it formulated the IEP.  (Pls.' Mem. 9-13; Reply Mem. Law Supp. Mot. Summ. J. (Docket No. 22) ("Pls.' Reply") 3-5).  Second, they argue, as a substantive matter, that Defendants failed to demonstrate that a 12:1:1 staffing ratio was appropriate for M.M.  (Pls.' Mem. 14-15; Pls.' Reply 5-6).  Finally, they challenge the adequacy of P811X, the offered placement for M.M., and take issue with the SRO's reversal of the IHO's decision to award costs of nursing as an equitable matter.  (Pls.' Mem. 17-22; Pls.' Reply 6-10).  The Court addresses these contentions in turn.

9

**A.  Procedural Adequacy**

Plaintiffs argue first that the information considered by the CSE in developing M.M.'s IEP was inadequate.  Specifically, Plaintiffs contend that the CSE relied "exclusively" on the December 2011 Cooke progress report and received only "limited input" from the Cooke representatives.  (Pls.' Mem. 10).  As both the IHO and SRO found, however, the evidence indicates otherwise.  That is, while the "CSE relied *primarily*" on the Cooke progress report, it "also considered and the January 2012 IEP incorporated information derived from a number of sources including the student's physician, previous evaluations, and the members of the January 2012 CSE."  (SRO Decision 6 (emphasis added); *see also* IHO Decision 4-5).  That finding is amply supported in the record.  (*See* Tr. 46-49, 52-59, 356-58).  The record also makes plain that the input of the Cooke teachers and administrator was not "limited."  Assistant Director Tabone participated in the entire meeting.  (Tr. 46-47).  And while Prusock and Gray participated in only part of the meeting to provide further information and insight on M.M.'s development in their subject areas (Tr. 52-54), CSE member Alvarez testified to the significance of their input in stating that "what's most important is what the teachers are saying."  (Tr. 58; *see also* Tr. 356-57 (N.M. conceding that the input of Tabone, Prusock, and Gray was not restricted)).

With respect to the record, Plaintiffs are on firmer ground in asserting that no formal vocational assessment was conducted for M.M.  (*See* IHO Decision 5).  But, contrary to Plaintiffs' contention, the absence of a formal vocational assessment does not constitute a procedural violation warranting relief.  (Pls.' Mem. 12).  Even without a formal vocational assessment, the CSE and IEP sufficiently addressed M.M.'s goals and needs for transitioning "from school to post-school activities."  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(fff)(5).  In particular, Tabone provided information regarding M.M.'s vocational issues to the CSE.  (*See* Tr.

55-56, 70-71, 88, 357).  As the SRO found in light of the record, "the information provided by Cooke was the most current available . . . and was sufficient to identify the student's adaptive living skills needs and overall vocational abilities."  (SRO Decision 6).  That was sufficient.  *See, e.g.*, *D.J. v. N.Y.C. Dep't of Educ.*, No. 12-CV-7009, 2013 WL 4400689, at *4 (S.D.N.Y. Aug. 15, 2013) ("The IDEA . . . does not compel a school district to perform every sort of test that would arguably be helpful before devising an IEP, particularly where, as here, the student had already been subject to relevant evaluations." (internal quotation marks omitted)).  And to the extent the information was not sufficient, the resulting violation did not impede M.M.'s right to a FAPE, significantly impede her parents' opportunity to participate in the decisionmaking process, or cause a deprivation of education benefits — the threshold for reversal of an SRO's decision on the basis of a procedural violation or violations.  *See R.E.*, 694 F.3d at 190.

**B.  Substantive Adequacy**

As noted, Plaintiffs also bring substantive challenges to the adequacy of the IEP.  To comply with its substantive obligations under the IDEA, a school district "need not maximize the potential of handicapped children."  *M.W.*, 725 F.3d at 143 (internal quotation marks omitted).  Instead, it need only provide "an IEP that is likely to produce progress, not regression."  *Cerra*, 427 F.3d at 195 (quoting *Walczak*, 142 F.3d at 130).  The Second Circuit has cautioned that "deference [to state decisionmakers] is particularly important when assessing an IEP's substantive adequacy."  *Id.*; see *id*. ("We have not hesitated to vacate district court opinions where the district court erred in substituting its judgment for that of the agency experts and the hearing officer." (internal quotation marks omitted)).  Here, the decisions of the IHO and SRO were generally well reasoned, thorough, and careful.  Accordingly, they warrant deference.  *See*

*M.H.*, 685 F.3d at 241 ("Deference is particularly appropriate when the state hearing officers' review has been thorough and careful." (internal quotation marks and alteration omitted)).

With that deference in mind, the Court turns to Plaintiffs' two substantive challenges to the IEP.[2]  First, Plaintiffs challenge the adequacy for M.M. of a "12:1:1" classroom, with twelve students, one teacher, and one paraprofessional.  (Pls.' Mem. 14-15).  That challenge is unpersuasive for two independent reasons.  First, Plaintiffs waived the challenge because, when questioned by the IHO at the hearing about the adequacy of the 12:1:1 recommendation, N.M. expressly indicated that she did not object to it, but only to its implementation at the particular school site recommended.  (IHO Decision 11; SRO Decision 7; *see* Tr. 382-83).  "The key to the [IDEA's] due process procedures is fair notice and preventing parents from 'sandbag[ging] the school district.'"  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77-78 (2d Cir. 2014) (quoting *R.E.,* 694 F.3d at 187 n.4).  Applying that principle, courts have held that parents generally may not challenge an IEP on a ground that they failed to include in their due process complaint.  *See id.*; *N.K. v. N.Y.C. Dep't of Educ.*, No. 15-CV-1468 (PKC), 2016 WL 590234, at *5 (S.D.N.Y. Feb. 11, 2016) ("Courts routinely limit a parent's challenge to the adequacy of a student's IEP, for example, to the problems raised in the parent's complaint." (citing cases)). The principle applies even more strongly, however, when, as here, parents expressly indicate that they agree with a CSE's recommendation.  Put simply, parents should not be heard to complain after the fact about a recommendation that they themselves approved.  *Cf., e.g.*, *FB v. N.Y.C. Dep't of Educ.*, No. 14-CV-3902 (PAE), 2015 WL 5564446, at *11 (S.D.N.Y. Sept. 21, 2015)

---

[2]      Plaintiffs also argue that the IHO improperly shifted the burden of proof from Defendant to Plaintiffs (and that the SRO then "rubber-stamped" that error).  (Pls.' Mem. 14).  Putting aside the question of whether that challenge is properly considered procedural or substantive, it is without merit.  The IHO expressly acknowledged that the "DOE has the burden of proof as to whether [a] FAPE was provided."  (IHO Decision 8).

(holding that a claim was not waived when "[t]he Parents have both timely *and consistently* raised th[e] claim" (emphasis added)).

Second, and in any event, Plaintiffs' challenge fails on the merits. *See A.S. ex rel. S. v. N.Y.C. Dep't of Educ.*, 573 F. App'x 63, 65-66 (2d Cir. 2014) (summary order) ([A]s . . . the . . . district court went on to consider the merits . . . the Plaintiffs suffered no harm from the finding of waiver.").   New York law mandates that "[t]he maximum class size for those students with severe multiple disabilities, whose programs consist primarily of habilitation and treatment, shall not exceed 12 students."  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(h)(4)(iii).  "Within the general parameters of [New York's regulations], class size and student-teacher ratios involve questions of methodology more appropriately answered by the state and district decision-makers than by federal judges."  *D.J. v. N.Y.C. Dep't of Educ.*, No. 12-CV-7009 (PAC), 2013 WL 4400689, at *5 (S.D.N.Y. Aug. 15, 2013) (internal quotation marks omitted).  More to the point, the question for this Court is not whether the class size was "the best possible" class size for M.M., *E.S. & M.S. ex rel. B.S. v. Katonah-Lewisboro School District*, 742 F. Supp. 2d 417, 436 (S.D.N.Y. 2010), *aff'd*, 487 F. App'x 619 (2d Cir. 2012), but rather whether it complied with New York regulations, and, with respect to the IDEA, whether M.M. was likely to progress, and not regress, within the class, *Cerra*, 427 F.3d at 195.  Here, both the IHO and SRO concluded that a 12:1:1 ratio was appropriate and not substantively inadequate.  (IHO Decision 11; SRO Decision 7).  Mindful of the deference owed to their decisions, the Court finds no basis to disturb their conclusion.

In arguing otherwise, Plaintiffs claim that the IHO relied on inaccurate facts with respect to the class sizes at Cooke, stating that "at the time of the meeting, none of M.M.'s classes at Cooke had a higher staffing ratio than 7:2," and that the SRO simply "rubber-stamped" the

IHO's determination.  (Pls.' Mem. 15).  At the hearing, there was indeed testimony as to class

size at Cooke.  (Tr. 154, 227-28, 282-83, 299-300, 367, 382-83).  The IHO, who heard that

testimony firsthand, did note, as a general matter, that "at the Cooke Center many classes have

the [12:1] ratio and some have 14:1 or 17:1 ratios."  (IHO Decision 11).  With respect to *M.M.'s*

classes in particular, however, the IHO noted that during the Cooke summer session, the

classroom ratio had been 12:1:1.  (*Id.*).  Those statements are supported by the record.  (*See* Pls.'

Mem. 15 (conceding that "M.M. received adaptive skills instruction in a class comprised of

between 14 and 17 students"); Tr. 367 (N.M. conceding that M.M.'s summer session class had a

ratio of 12:1:1)).  Plaintiffs also suggest that the CSE relied on insufficient evidence for its

determination, questioning the credibility of Alvarez, the DOE's witness with respect to the

issue.  (*See* Pls.' Mem. 14).  But "[d]istrict courts are not to make subjective credibility

assessments, and cannot choose between the views of conflicting experts on controversial issues

of educational policy in direct contradiction of the opinions of state administrative officers who

had heard the same evidence."  *M.H.*, 685 F.3d at 240 (internal quotation marks and alterations

omitted).  In short, there are no grounds to disturb the determinations of the IHO and the SRO

that a 12:1:1 classroom placement was appropriate under the IDEA and New York law.

Plaintiffs' second substantive challenge is to the adequacy of the IEP's goals, particularly

the IEP's alleged failure to include specific reading goals.  (Pls.' Mem. 15-17).  With respect to

the IEP's goals, the IDEA mandates that an IEP include "a statement of measurable annual goals,

including academic and functional goals, designed to . . . meet the child's needs that result from

the child's disability to enable the child to be involved in and make progress in the general

education curriculum[,] and . . . meet each of the child's other educational needs that result from

the child's disability."  20 U.S.C. § 1414(d)(1)(A)(i)(II); *see also* 34 C.F.R. § 300.320(a)(2)(i);

N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2)(iii).  The conclusions of the IHO and SRO

with respect to the sufficiency of an IEP's goals carry substantial weight, as "the sufficiency of

goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires

deference to the expertise of the administrative officers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346

F.3d 377, 382 (2d Cir. 2003).  Here, the IHO rejected N.M.'s challenge to the IEP's goals,

finding that the goals were established by the Cooke Center (which "was in the best position to

fashion goals for this student"); that the members of the CSE, *including* N.M., "all agreed to the

goals at the time of the IEP meeting"; and that, "if the student reached her goals at any time

during the school year, the IEP could be amended and goals could be added."  (IHO Decision 9).

The SRO agreed that the goals were adequate based on a thorough review of the IEP, and stated

as follows:

> To address [M.M.'s] deficiencies the student's January 2012 IEP contained
> approximately 10 annual goals and 33 short term objectives to address the
> student's needs . . . .  In addition, a review of the annual goals reveals that,
> contrary to the parent's contention, all of the annual goals included the required
> evaluative criteria (i.e., 60 percent accuracy, three out of five trials), evaluation
> procedures (i.e., teacher observation, checklists, teacher-made materials), and
> schedule to be sued to measure progress (i.e., three times per year, one time per
> quarter).

(SRO Decision 6-7).  The SRO likewise noted both that N.M. conceded that she had participated

in the discussion of the goals at the CSE and had not disagreed and that the goals were adopted

from Cooke's own report, issued only about one month earlier.  (*Id.* at 7).

In challenging the decisions of the IHO and SRO, Plaintiffs make four points, all of

which fall short.  First, Plaintiffs argue that it was inappropriate for the IEP to adopt Cooke's

recommendations.  (Pls.' Mem. 15).  But Plaintiffs cite no authority for the proposition that

drawing goals from such a progress report is a violation of the statute or regulations.  That the

Cooke report was still dealing with the 2011-2012 school year, whereas the IEP provided for the

2012-2013 school year, does not by itself make the IEP's goals inadequate.  Indeed, given that the Cooke report and the CSE meeting were only one month apart, it seems reasonable that the report, developed by M.M.'s then-teachers and counselors, would play a significant role in the IEP's development.  Second, Plaintiffs contend that the IHO's consideration of possible mid-school-year amendments to the goals was improper under *Reyes v. New York City Department of Education*, 760 F.3d 211, 219-21 (2d Cir. 2014), which held that a court should "not take into account the possibility of mid-year amendments when assessing the substantive adequacy" of an IEP.  (Pls.' Mem. 16).  That may be, but it was not a basis for the decision of the SRO, who conducted his own thorough and well-reasoned review of the record.  Third, Plaintiffs contend that, despite N.M.'s concerns (evidenced in the IEP) with respect to M.M.'s reading abilities, the IEP did not mention "M.M.'s difficulties with reading comprehension."  (Pls.' Mem. 16).  But that is incorrect, as the IEP contains goals to "strengthen and develop [M.M.'s] reading skills." (Ex. 1, at 7).  Finally, Plaintiffs complain that the IHO and SRO failed to adopt the testimony of some witnesses that certain goals were inappropriate.  (Pls.' Mem. 16).  But, as already noted, it is not the role of this Court to "choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence."  *M.H.*, 685 F.3d at 240 (internal quotation marks and alterations omitted).  Here, deference to the state decisionmakers is especially appropriate, as both the IHO and SRO concluded that the goals were sufficient and measurable.

In sum, Plaintiffs' challenges to the substantive adequacy of the IEP fall short.

## C.  P811X's Ability To Implement the IEP

Next, Plaintiffs challenge the adequacy of P811X, the DOE's proposed placement for M.M.  (Pls.' Mem. 17-22; Pls.' Reply 6-9).  The DOE may place a student at any school site it

chooses, so long as the school can satisfy the requirements of the IEP.  *See R.E.,* 694 F.3d at 191-92; *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009).  A plaintiff may challenge a school assignment based on the school's *inability* to implement an IEP; by contrast, "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."  *R.E.*, 694 F.3d at 195.  In an effort to "clarify the proper reach" of that principle, the Second Circuit has explained recently that

> it is not speculative to conclude that an IEP recommending a seafood-free environment, for a child with a life threatening seafood allergy, could not be implemented at a proposed school that was not seafood free.  Nor is it speculative to conclude that an IEP recommending one-on-one occupational therapy, outside of the classroom, could not be implemented at a school that provided only in-class occupational therapy in a group setting.

*M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 244 (2d Cir. 2015) (citations omitted).  Incapable of delivering what the IEP requires, such schools are "facially deficient."  *Id.* at 245.  If parents present such non-speculative objections to a proposed school, then "the school district . . . ha[s] the burden to produce evidence demonstrating [the placement's] adequacy in response to these arguments."  *Id.*

Applying those standards here, the Court concludes that Plaintiffs' three grounds for challenging the placement are "speculative" and that DOE has made a sufficient showing that P811X was capable of providing the services required by M.M.'s IEP in any event.  First, Plaintiffs contend that the IHO and SRO erred by ignoring or failing to address Plaintiffs' claim that P811X "would not have" put M.M. in an appropriate classroom of peers and peer models. (Pls.' Mem. 20-21).  By its terms, however, a claim based on what a school "would not have" done — as opposed to a claim based on what the school *could not do* — is speculative and barred under *R.E.* and *M.O.*  In any event, Plaintiffs cite to evidence that refutes their own claim — testimony that P811X has fifteen 12:1:1 classes into which students are placed upon

consideration of the IEP, the student's functional level, and the student's age group (Tr. 103-104,

123) — and point to no evidence supporting it. (Pls.' Mem. 21). Plaintiff's second argument —

that the school "would not appropriately provide M.M. with her mandated related services," such

as oxygen (Pls.' Mem. 20) — is equally speculative.  In addition, the DOE produced evidence at

the hearing — which, as above, Plaintiffs cite on behalf of their own arguments (Pls.' Mem. 21)

— in the form of testimony that the school can provide the necessary related services and, in

fact, already has students with oxygen tanks.  (*See* Tr. 105-106, 109).

Plaintiffs' final objection to P811X — that the school did not have adequate adaptive

learning, travel training, or vocational offerings — was in fact one of N.M.'s bases for rejecting

the placement in the first instance.  (*See* Ex. C, at 3 ("I'm afraid [M.M.] will not receive adequate

travel training, vocational training, or instruction to support independence."); *see also* Pls.' Reply

8 (substantially abandoning the first two arguments and reiterating only the adaptive learning

argument)).  Nevertheless, Plaintiffs' objections here fail for substantially the same reasons.  For

one thing, they are speculative.  After all, Plaintiffs do not contend that P811X "lacks . . .

services required by the IEP."  *M.O.*, 793 F.3d at 244.  M.M.'s IEP did not specifically require

any particular work or community experiences about which Plaintiffs complain.  The IEP simply

stated with respect to the transition to post-school that M.M. "[w]ill continue community based

[sic] learning experiences" and that she will "continue participating in an internship and

community services."  (Ex. 1, at 12).  Instead of claiming that P811X lacks such opportunities,

Plaintiffs complain that M.M. "might have to wait" to participate in an *off-site* work program;

that, once participating, it is "extremely unlikely" she would also receive her related services;

and that community experiences were limited to garden and community walks.  (Pls.' Mem. 21-

22; Pls.' Reply 8).  The first two complaints are, by their own terms, speculative; the third fails

because the IEP does not "specifically require" particular community experiences.  *See B.P. v. N.Y.C. Dep't of Educ.*, — F.3d —, 2015 WL 9487873, at *2 (2d Cir. Dec. 30, 2015) ("As for plaintiffs' claim that the school lacked an adequate sensory gym, S.H.'s IEP did not specifically require access to such a facility.  Rather, it dictated that S.H. have access to sensory equipment."); *M.H.*, 685 F.3d at 224 (noting that an IEP "need not furnish every special service necessary to maximize each handicapped child's potential") (internal quotation marks omitted).

In any event, even if Plaintiffs' objections to P811X's community and work offerings were not barred as speculative, the DOE offered sufficient evidence that the school was appropriate in that regard.  For example, the DOE adduced testimony from the parent coordinator at P811X that the school has approximately ten different work sites, to which the students are assigned after consideration of the student's IEP and in consultation with a teacher or staff member who knows the student (Tr. 106-107); that students in wheelchairs and on oxygen are still able to visit the work sites (Tr. 125); that some work sites are four days per week while others are three days per week (Tr. 126); that students continue to receive academic instruction and related services while enrolled in a work-site program (Tr. 128-29); that students usually, but not necessarily, wait a year before enrolling in an off-site work program (Tr. 127); that students may also work at the school in various capacities (Tr 107-08); that the school provides travel training for riding the bus or train (Tr. 110); and that the school has a classroom modeled as an apartment to teach independent living skills (Tr. 112-13).  To the extent N.M. "relied on information from" her school visit to reach contrary conclusions about the school's offerings, she "bore the risk that the school district would, in fact, satisfy its burden of proving the appropriateness of the challenged placement."  *B.P.*, 2015 WL 9487873, at *2.  In short, as

19

Plaintiffs do not contend P811X "lacks the services required by the IEP" and, to the extent they

do, their complaints are refuted by the evidence, Plaintiffs' objections to P811X do not succeed.

**D.  Reimbursement for Nursing Expenses**

Finally, Plaintiffs' challenge to the SRO's reversal of the IHO's "equitable" decision to

order the DOE to reimburse M.M.'s parents for the costs of M.M.'s school-day nurse is without

merit.  (Pls.' Reply 9-10).[3]  As the SRO noted (SRO Decision 7), because the DOE offered M.M.

a FAPE, the IDEA does not entitle her parents to reimbursement for the costs of her tuition at

Cooke or to reimbursement for "related services," such as nursing services, that she received in

that school year.  *See* 20 U.S.C.A. § 1412(a)(10)(C)(i) ("[T]his subchapter does not require a

local educational agency to pay for the cost of education, including special education and related

services, of a child with a disability at a private school or facility if that agency made a free

appropriate public education available to the child."); 34 C.F.R. § 300.148 (same).  The SRO

could find no statute or regulation entitling M.M.'s parents to such reimbursement, and Plaintiffs

identify none.  Thus, there is no basis to disturb the SRO's decision on that score either.

## CONCLUSION

The Court has no shortage of sympathy for M.M.'s parents, who, no doubt, were

motivated by the best of intentions in caring for their severely disabled daughter and have

incurred their fair share of financial expenses in the process.  For the reasons explained above,

however, the Court is compelled to conclude that their challenges to the decision of the SRO fall

short and, thus, that they are not entitled to reimbursement for their decision to enroll M.M. at

---

[3]      Evidently, the DOE did pay the costs attributable to the nurse's services during
transportation to and from school.  (*See* Def.'s Mem. 5 n.5).

Cooke for the 2012-13 school year.[4]  Accordingly, Plaintiffs' motion for summary judgment is

DENIED, and Defendants' cross-motion for summary judgment is GRANTED.

The Clerk of Court is directed to terminate Docket Nos. 14 and 20, and to close this case.

SO ORDERED.

Date:  February 24, 2016
       New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[4]      In light of the Court's conclusion that M.M. was not denied a FAPE, there is no need to
address the appropriateness of Cooke as an alternative placement or the balance of equities.